### CROW v. GORE et al.
### No. 6519.

United States Court of Appeals for the District of Columbia.

Decided June 8, 1936.

W. Gwynn Gardiner, James M. Earnest, I. Irwin Bolotin, and Lawrence Koenigsberger, all of Washington, D. C., for appellant.

Chas. A. Douglas, Jo. V. Morgan, and Edmund D. Campbell, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

An appeal from a decree in a suit brought to set aside a contract on the ground of fraud and re-establish a trust.

It appears that in August, 1931, the defendant, H. Grady Gore, purchased from the plaintiff, Edward B. Dean, Sr., certain real estate known as the Drury Apartments, located in the District of Columbia, at the purchase price of $45,000, of which $1,000 was paid in cash and the balance in a deferred purchase note for $44,000 payable at the rate of $400 a month, the latter secured by first deed of trust upon the purchased premises.

In January, 1932, Gore entered into an agreement with Dean to pay $35,000 in cash for the property, such sum to be in satisfaction of the first note of $44,000. Gore made a deposit of $500 with Dean as a pledge for the performance by him of this contract. He failed to complete the contract, and accordingly this sum was forfeited to Dean, and retained by him.

On February 26, 1932, a new arrangement was entered into between the parties to take the place of the former agreement, and Gore executed a first trust note to Dean upon the property for $20,000 payable 3 years after date with 6 per cent. interest, and also executed to Dean a second trust note for $14,000, guaranteed by the defendant, Jamie Shorter Gore, his wife, payable $175 per month,

including interest at 7 per cent. These trusts were accepted by Dean in exchange for the existing first trust note of $44,000 upon the property.

These circumstances, however, are not involved in the present case, but are recited in the record as a history of the facts leading up to the issue involved herein.

Afterwards, to wit, on October 4, 1933, the parties entered into an arrangement whereby Dean canceled and discharged the promissory note of $14,000, which had been reduced by payments to the amount of $12,330, in consideration of the payment to him by Gore of $5,000 in cash. This arrangement was immediately executed by the parties in conformity with these terms.

Afterwards, to wit, on March 20, 1934, a bill in equity entitled "A bill to reestablish a trust" was filed by Dean in the lower court against Gore, in which it was sought to cancel and set aside the last-mentioned agreement between the parties upon the ground that the consent of Dean to this arrangement was obtained by Gore by means of fraudulent representations, overinfluence, and overreaching.

It was alleged in the bill that just prior to October 4, 1933, Gore called at the home of Dean in the District and there represented and stated to Dean and others present that he, Gore, had had a talk with Mr. Hull, the Secretary of State, and that Mr. Hull had told him that the United States would go to pieces within a period of 6 months; that apartment houses and properties would be of no value, and that there was only one way of saving the situation, and that was to convert everything into cash; that this was a second trust note; that the owner of the first trust was then demanding a big curtail payment on the balance due on the first trust on this property and was also demanding the payment of all of the income from said property; that he, Gore, was without money; that his wife was without money, and that they would have to give up the property and let the second trust note, held and owned by the plaintiff, be a total loss to him, but that they, defendants, would try to help him out by giving him a $5,000 note payable $1,000 cash and the balance payable $1,000 a month for four months, secured by Liberty bonds of $5,000, and he could put that note in the bank and get the $5,000, which was better than losing everything; that he, Gore, would pay this as a matter of friendship and interest in the plaintiff; that plaintiff is a man past 80 years of age, is in feeble health, and is almost blind; that his wife is also in poor health, is old, and has no business experience; that they both believed the statements made to be true, became much frightened, and without seeking advice from any one, and without making any inquiry, agreed to deliver up the note, that is the second trust note above described secured on the said property above described, to the defendant, Gore, upon the payment of the $1,000 in cash, and the payment of $1,000 per month for four months thereafter, believing that in this manner they would get the $5,000 before the expiration of the six months' period fixed at which property, and especially second trust notes, would be of no value.

These charges were denied in the answer filed by Gore, and the case went to trial in the lower court. The trial justice found against the plaintiff Dean, and dismissed the bill. Whereupon, the present appeal was taken.

The evidence submitted at the trial consisted almost entirely of the testimony of the respective parties, Dean and Gore. The testimony of Dean was a repetition of the charges made in the bill and need not now be repeated.

On the other hand, the defendant Gore as a witness in his own behalf testified that he saw the plaintiff at his residence at the time of the making of the contract and advised him that the rents on the building had fallen as low as $382.50 per month which was not sufficient to carry the first trust; that some change would have to be made in the transaction and he stated, "I am willing to make you a deed to the property. You have got what I put in it. I am willing for you to have it"; that he was delinquent in taxes for about a year and a half and that the first trust people were pressing him to make these payments of about $1,200 or $1,300; that plaintiff said that he would not take the property back; that he asked plaintiff, "If you won't take a deed back to the property will you take over the management of it and out of the rents take care of the first trust and the taxes and not jump on Mrs. Gore or myself about the

deficiencies, and let the property see if it will work itself out, or conditions of things will improve?"; that plaintiff said that he did not want to take the management back in his hands; that he then said to plaintiff, "If you will take it back I will pay the janitor out of my own pocket or out of some other income, and I will keep the apartments decorated, papered and painted"·; that plaintiff said he would not consider taking the building back, under any circumstances; that plaintiff said there was but one thing he would do, and asked Gore how much cash he would give him for the note; that this was the first time that any cash or any buying of note was mentioned; that Gore said he did not have any cash to offer plaintiff; that plaintiff then told Gore that if he would give him $5,000 he would surrender the note; that Gore obtained $5,000 in bonds to be used as collateral; that on the morning of October 4, 1933, he went to plaintiff's home and advised plaintiff that he could not give him the cash, but that he could raise $1,-000 in cash and could arrange to give a $5,000 bond to secure the balance; that they went to the bank and closed the transaction.

Gore testified that he did not represent and state to plaintiff and others present that he had had a talk with Mr. Hull, Secretary of State, and that Mr. Hull had told him that the "United States would go to pieces within a period of 6 months" or that apartment houses and properties would be of no value, and that there was only one way of meeting the situation, and that was to convert everything into. cash, and that he did not make any representation to Dean like that.

The foregoing testimony sufficiently sets out the controversy involved in this case. There is some corroborating evidence in the case, but a decision upon the facts depends largely upon conclusions drawn by the court from these statements of the parties. The burden of proof was upon the plaintiff. The trial court held for the defendant, and made the following finding of· fact: "The plaintiff did not rely upon any false statements made to him by the defendant H. Grady Gore (if any were made) as an inducement to enter into or to consummate the said agreement of exchange." The court further said: "It seems to be almost incredible that the defendant should have made the statements upon which the charges of fraud are predicated, and still more in-

credible that the plaintiff should have believed them, if made. While the plaintiff is of advanced age, he is a man of experience in real estate transactions, and still of vigorous mentality. The defendant offered to surrender to the plaintiff the property which he had bought of him. This the plaintiff refused and agreed to take $5,000, part costs, and Liberty bonds to secure the remainder, in payment of a second trust note for $14,000, payable in instalments. While the difference is large, it is not in itself sufficient ground for setting aside the transaction. At the time of the exchange the values of second trust notes were problematic and it might well be that the plaintiff received the value of his note."

The trial justice saw the witnesses and heard their testimony. He was the better qualified to determine what credence and weight should be given to the testimony of the witnesses. This court must not disturb the determination made by the trial court upon the conflicting evidence set out in the record.

In McLarren v. McLarren, 45 App. D.C. 237, 238, 1 A.L.R. 1412, we said: "The appeal presents no question of fact of sufficient importance as a precedent to justify an extended review of the evidence. It was tried in open court, with full opportunity in the trial justice to observe the demeanor of witnesses and to judge of their veracity. In such cases the finding of the trial justice on questions of fact has much the same sanctity as the verdict of a jury, and will not be disturbed on appeal unless a mistake of judgment is so apparent as to demand a reversal." See, also, Ellison v. Splain, 49 App.D.C. 99, 101, 261 F. 247; Manning v. American Security & Trust Co., 50 App.D.C. 194, 195, 269 F. 710; Burroughs v. Burroughs, 55 App.D.C. 269, 270, 4 F.(2d) 936; Castleman v. Avignone, 56 App.D.C. 253, 256, 12 F.(2d) 326.

It is contended by appellant that the alleged satisfaction by the defendant of the $12,330 note by the payment of $5,-000 would be invalid and void for want of consideration. We think, however, that the payment by defendant of the entire debt before the time of its maturity furnishes a valid consideration for the support of the contract. It is said in 6 R. C.L. 665: "At an early date the rule that the performance of a legal obligation does not furnish a consideration for a contract

294

was applied to a promise to discharge a liquidated debt upon the payment of a smaller sum on the day fixed by the contract or after default. This conclusion has been generally adhered to, and the rule thus established still prevails in most jurisdictions. But even in these jurisdictions the courts have frequently criticised the reasonableness or fairness of the rule. As the rule is not favored the decisions indicate in a striking manner the extreme ingenuity of the courts in avoiding its operation. They have failed to apply the rule whenever they could discover some circumstance, however trifling, which would be considered as a technical legal consideration. Accordingly if the creditor accepts a part payment in a manner different from that required by the contract or before the maturity of the debt, a sufficient new and additional consideration for his promise to discharge the entire debt is deemed to be present."

Accordingly, we affirm the decision of the lower court, with costs.

Affirmed.